IN THE UNITED STATES DISTRICT COURT FOR THE

WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| DEANNA DAVENPORT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.  CIV-05-915-L |
| | ) | |
| AETNA LIFE INSURANCE COMPANY, | ) | |
| a foreign corporation, | ) | |
| | ) | |
| Defendant. | ) | |

### O R D E R

### *Introduction*

Plaintiff Deanna Davenport filed her complaint for determination of eligibility

for disability benefits pursuant to the Employment Retirement Income Security

Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(1)(B).  The complaint alleges that

plaintiff initially received benefits for a period of 24 months, but her claim for long

term disability benefits was later denied by defendant.  In addition to its answer

denying plaintiff's entitlement to benefits, defendant Aetna Life Insurance

Company filed a counterclaim for recoupment of overpayment of benefits caused

by plaintiff's receipt of Social Security benefits.  Plaintiff and defendant agreed

that this case may be submitted to the court on the administrative record and

simultaneously filed opening and reply briefs.  Having considered the

administrative record and the parties' briefs on the merits, the court finds that

defendant's decision denying plaintiff's claim for long term disability benefits should be affirmed, but that its counterclaim should be denied, for the reasons stated below.

## *Factual Background*

As stated, plaintiff's claims arise from defendant's denial of her claim for long term disability benefits.  The record[1] establishes that plaintiff was covered by a long term disability benefit plan provided by her employer, Cox Enterprises, Inc. ("Cox").  A-D 1-15.  The plan provided that the long term disability benefits were to be paid from the funds of plaintiff's employer, Cox.  A-D 5.

To be entitled to long term disability benefits under the plan, the participant was required to meet the following definition of total disability:

> You are not able, solely because of injury or disease, to work at any reasonable occupation.  (This is any gainful activity for which you are, or may reasonably become, fitted by education, training or experience.  It does not include work under an approved rehabilitation program.)

A-D 6.

Defendant was the claims administrator for the long term disability benefit plan provided by Cox.  The record shows that defendant entered into an Administrative Services Contract ("ASC") with Cox to serve as claims administrator which provided in pertinent part as follows:

---

[1]        Pages of the administrative record are identified by a Bates-numbering system which includes  the prefix "AET-DAV."  The court adopts the shortened version used by defendant in its briefs.  Thus, the court's references to the administrative record will be cited as "A-D __ " with unnecessary zeroes omitted.

> In exercising its fiduciary responsibility, [defendant] shall have the discretionary authority to determine, subject to the terms of the Plan, whether and to what extent participants and beneficiaries are entitled to benefits, and to construe disputes or doubtful Plan terms.  [Defendant] shall be deemed to have properly exercised such authority unless it has abused its discretion hereunder by acting arbitrarily and capriciously.

A-D 58.

By letter dated April 29, 2004, defendant denied plaintiff's claim for long term disability benefits.  A-D 399-402.  The letter states in part:

> On March 15, 2004, a letter was faxed to Dr. Lawler[2] for medical information to assist us with our investigation to determine your ability to perform any reasonable occupation because of injury or disease.  We requested all office visit records since 11/03/2003 through the present plus the latest stress test and cardiac consultative report.  We received the office visit records and cardiac workup records.

A-D 400.

The letter further states that, "based on information provided to date, you are not totally disabled from performing any reasonable occupation as defined in the plan based on information received to date . . .".  A-D 400.  In the letter, defendant states that it "will review any additional information you care to submit, such as medical information from all physicians who have treated you for the condition(s)" and gave examples of the sort of information that could be submitted to help in reviewing the claim.  A-D 401.

---

[2]   Plaintiff identifies Dr. Lawler in her briefs as her primary care physician.

The August 18, 2004 Medical Director Review ("MDR") (A-D 525-528) was prepared by Rick Snyder, D.O., M.P.H., Diplomate, American Board of Preventive Medicine in Occupational Medicine, and Diplomate, American Osteopathic Board of Family Practice.  The MDR indicates that Dr. Snyder was to "review all medical data to assess for restrictions that would prevent the employee from returning to work full time after 4/5/04." A-D 525.  The *Brief Synopsis of History and Demographics* section of the MDR states that plaintiff is a 41 year old female Customer Service Representative who stopped working in February, 2002.  The MDR states that plaintiff has a history of atypical chest pain, congestive heart failure, gastric bypass surgery, hypertension and bilateral osteoarthritis of the knees.  A-D 525.  Dr. Snyder indicates that he has "reviewed the entire file." Plaintiff's *Medical Conditions per Attending Physicians* are identified as:

- Bilateral knee osteoarthritis (OA)

- History of congestive heart failure (CHF)

- Obesity, status post gastric bypass

- Hypertension (HTN)

- Atypical chest pain

- Asthma

- Anxiety

- Scarring secondary to burns

- Chronic fatigue

The MDR includes Dr. Snyder's recitation of the *Attending Physician's*

*Opinion re: Impairments, Restrictions and Limitations* as follows:

> On 8/23/02 the claimant reported that high stress, mental and time
> demands prevented her from doing her "old" job.  She reported
> constant shortness of breath resulted in an ability [sic] to carry on
> conversations.  She noted bilateral knee pain, CHF and an enlarged
> heart.

> Dr. Lawler is the only provider who has opined on the claimant in the
> file.  In his initial attending physician statement (APS) of 9/16/02 he
> opined less than sedentary capacity, noting diagnoses of CHF and
> chest pain.  He noted an ejection fraction of 49%.  On 9/30/02 he
> opined sedentary capacity and noted she was ambulatory.

> On 9/30/03 Dr. Lawler reported on a Certificate of Permanent and
> Total Disability to the US Dept. of Education that the claimant states
> she is unable to work.

> On 1/7/04 an APS from Dr. Lawler indicates the claimant can
> occasionally sit, stand, walk, grasp, do fine manipulation and
> drive/travel.  He opined capacity for 1 hr/day, three days per week.
> On 5/6/04 he completed another APS and a letter that provided
> essentially the same information as 1/7/04.  He noted diagnoses of
> chronic chest pain/scarring, chronic fatigue, anxiety and bilateral
> knee OA.  He opined she was unable to do sedentary work due to
> pain and limits of body motion secondary to scarring.  He noted she
> needed to rest 2-3 hrs/day and had to elevate her feet.

A-D 525-526.  The *Analysis of the Medical Evidence* section of the MDR lists the

following tests:

2/23/00: normal echocardiogram
6/4/02: random glucose 147

6/11/02: random glucose 168, potassium 3.4

7/2/02: random glucose 116

7/8/02: EKGs: sinus tachycardia (102 bpm) and normal sinus rhythm with varying 1st degree AV block

8/28/02: CPK levels and MB fractions normal; Troponin 1 normal; potassium 3.6; Chest x-ray is reported as unremarkable with no active cardiopulmonary disease

8/8/03: Dobutamine stress echocardiogram terminated secondary to adverse effects

11/8/03: TSH and free TF normal

1/9/04: Bilateral knee x-rays note a right suprapatellar effusion, mild bilateral tibial spurs and mild superior patellar spurs.  There is question of a loose body.  There is no note of any joint space narrowing or osteoarthritis

A-D 526.  Additionally, Dr. Snyder noted the following *Clinical Evaluations*:

Dr. Wong: cardiology

On 3/4/02 he reported an adenosine stress test was negative for ischemia.  He noted an ejection fraction at rest of 49%.  On 6/4/02 he evaluated the claimant during hospitalization after an Emergency Department (ED) visit for chest pain. He reported she was previously evaluated for chest pain with a nuclear stress test that was normal in 2/02.  He noted she was referred for catheterization.  The claimant reported no fatigue, asthma or arthritis. He noted mild hypertension and no acute distress.  Her cardiopulmonary exam was normal, including chest wall pain.  She had no edema.  He noted serial myocardial enzyme studies were normal.  He recommended coronary catheterization, treatment for hypertension and potassium replacement for mild hypokalemia.

Dr. Lawler: Family Medicine

Treatment notes beginning 6/3/02 report a history of CHF with recent chest pain and lower extremity edema.  It is reported she has 2-4+ edema but no other clinical findings consistent with active or progressive CHF as she has clear breath sounds and normal heart sounds.  She is given a diuretic.  On 7/8/02 she has no edema.  Dr. Lawler reports she has chest pain without etiology and notes her desire for disability.  He reports he can not find a reason for disability.

On 8/21/02 the claimant was admitted by Dr. Biggers after an ED visit for chest pain.  She was in no distress.  He noted an irregular rhythm but no murmur, rub or gallop.  Her lungs were clear and she had no edema or clinical evidence of CHF.  He noted cardiac enzymes were normal.  She was discharged on 8/22/02 to regular activity as tolerated.

On 9/4/02 she was seen at the University of Oklahoma Medical Center ED by Dr. Cook for complaints of shortness of breath and left sided chest pain.  A history noted sleep apnea, hypertension and a prior negative cardiac work up.  Her medications included Prinivil, atenolol and Protenix.  An exam did not evidence congestive failure or pulmonary compromise.  Reports of a chest x-ray noted her cardiac silhouette at the upper limits of normal.  Testing noted mild hypokalemia, a normal sinus rhythm on EKG, O2 saturations at 100% and normal cardiac enzymes.  She was discharged to home.

Dr. Lawler on 10/28/02 reported she had a gastric bypass several months prior.  He reported she used nitroglycerin with benefit for chest pain.  He reports she was well that day.  He opines hypertension but no blood pressure measures are given.  Additionally he reports diagnoses of bilateral knee OA and chest pain of uncertain etiology.  Physical exam of the claimant's knees was not done.  Prinivil was refilled.

On 8/8/03 the claimant was admitted by Dr. Beckman to Presbyterian Hospital for chest pain/unstable angina.  She was to have a dobutamine stress test.  She was discharged to activity as tolerated after an incomplete stress test with diagnoses of coronary artery disease without myocardial infarction, asthma and hypertension.

Dr. Lawler on 11/17/03 noted her complaints of dizziness, chest pain at rest and palpitations.  She reported being "tired all the time".  She reported bilateral knee pain due to OA.  He noted scarring based pain over the right side of her neck and trunk.  A cardiopulmonary exam was normal [ . . . ].  No adequate history is provided [ . . . ] of her fatigue or pain.  On 12/8/03 he reports she had a gastric bypass one year ago and has lost 75 pounds (now 222 lbs).  She reports occasional chest pain.  He notes she uses Cozaar and nitroglycerin.  An exam

notes knee crepitus and reports of knee pain.  The knee exam itself does not indicate structural instability or functional loss.  She is to recheck with him in 3 to 6 months.

On 1/9/04 University of Oklahoma Family Medicine notes a history of severe OA of both knees with some relief provided by Celebrex.  They note a systolic murmur, decreased active and passive knee range of motion with reports of pain and tenderness of the knees.  Celebrex 200 mg daily is given, knee x-rays are ordered and she is referred to orthopedics.

A-D 526-527.  In the August 18, 2004 MDR, Dr. Snyder summarizes his analysis

of the medical evidence as follows:

> In summary, the claimant is a 41 year old female with a history of obesity.
> She also has been opined to have a history of CHF, non-cardiac chest
> pain, asthma, scarring with contractures, bilateral knee OA with pain,
> anxiety and fatigue.  The medical notes no clinical findings that support
> active or progressive CHF or pulmonary impairment.  Despite frequent ED
> visits and hospitalizations, the claimant has not had a myocardial infarction
> or evidence of unstable angina.  Additionally, no complete examination of
> her upper extremities or torso has indicated restrictions in motion.  Her last
> reported medications include antihypertensives, as needed Lortab,
> Celebrex, proton pump inhibitors and potassium supplementation.  Of note,
> Dr. Lawler indicated he found no basis for disability after she had stopped
> working and reports that his opinion is based upon the claimant's report.

A-D 527-528.  Dr. Snyder stated his *Conclusions* as follows:

• Based on the medical data in the file and with a reasonable degree of
  medical certainty, the claimant has been and continues to be clinically
  stable from a cardiovascular and pulmonary perspective.  Throughout the
  data, the claimant has not evidenced ongoing clinical signs of congestive
  heart failure nor does she appear to have unstable angina or respiratory
  impairment.

- The medical data indicates that she may have some element of bilateral knee pain, but this does not appear entirely based upon osteoarthritis as her knee x-rays do not support findings of the severity reported by her physician.  Despite reports of bilateral knee pain, treatment levels indicate the use of Celebrex, but not to its full extent.  Although it is reported that pain is problematic, treatment with as needed hydrocodone and Celebrex are not consistent with severe pain.  Additionally, no clinical data reports significant walking dysfunction, but does notes she remains ambulatory.
- The medical data lacks an adequate history and clinical evaluation to assess the basis for her reports of fatigue and the impact on her function.  The claimant, given her history, likely has some aerobic deconditioning that would preclude consistent activities beyond the sedentary level at this time.
- Reasonable restrictions based upon the objective medical data would include no frequent walking or frequent stair climbing, no heavy lifting and no continuous standing.  Restrictions of her upper extremities or on sitting as opined by Dr. Lawler are not supportable given the data in the file.
- Based upon the medical data in the file, the claimant has no condition that would preclude full time work capacity with appropriate restrictions as indicated above after 4/15/04.

A-D 528.  Defendant's August 19, 2004 letter to plaintiff's attorney states that defendant is maintaining the decision to terminate plaintiff's claim for long term disability benefits after April 15, 2004.  Plaintiff was advised that this was defendant's "final decision" regarding her long term disability claim.  A-D 441.

Defendant's April 20, 2005 letter to plaintiff's attorney acknowledges the receipt of additional information in connection with plaintiff's claim for long term disability benefits.  A-D 530.  The additional information consists of an Emergency Room report of January 23, 2005, Consultation at the OU Medical Center dated January 26, 2005, pictures and a letter from Dr. Lawler dated

November 15, 2004 and March 21, 2005.  The letter states: "Even though Ms.

Davenport has exhausted her appeal right under ERISA, it has been determined,

in good faith, to review Ms. Davenport's file and the additional information to

determination the accuracy of the termination decision."  The letter indicates that

the additional medical information received from plaintiff had been referred to

defendant's medical consultant for review.  A-D 530.

On May 12, 2005 an addendum to plaintiff's medical file review was

prepared by Dr. Snyder. Clinical Referral/Review (Appeal), A-D 535-538.  In

addition to referencing his prior review of August 18, 2004, Dr. Snyder's

addendum recites the *Attending Physician's Opinion re: Impairments, Restrictions*

*and Limitations* as follows:

> Subsequent to the previous review I noted a letter on 9/24/03 indicating
> she was recently hospitalized at the University of Oklahoma Medical
> Center.  Dr. Lawler, her physician, indicates the claimant states she would
> never work again.  He reports she has had gastric modification surgery
> earlier in the year.  He notes her report of pain in her knees and her report
> of chronic fatigue.  He reports she has limited chest wall and body motion
> and severe scarring across her back, arms and neck.  He reports she is in
> pain, has heart problems and cannot work under stress.  He opines total
> and permanent disability.
>
> A 10/5/04 letter from Dr. Lawler opines permanent total disability.  He
> reports she has chronic chest wall pain and spasm due to massive scarring
> of her neck and back.  He reports she has chronic chest pain daily.  He
> again reports gastric surgery earlier in the year (no data on recent surgery).
> He reports limited chest wall and body motion capabilities.  A 10/7/04
> handwritten note from Dr. Lawler indicates she has chronic chest pain.  Dr.

Lawler reports she has extensive chest scarring due to a burn.  He also appears to indicate she has unstable angina.  An 11/15/04 letter of Dr. Lawler reports permanent total disability due to chest wall pain and spasm due to massive scarring of her neck and back.  He reports chronic dyspnea and daily chest pain.  He again reports gastric modification surgery earlier in 2004.  He reports on her knee condition and reports she has chronic fatigue.  He reports limited chest wall and body motion due to severe scarring.  (These letters are all very similar from Dr. Lawler).  He reports her symptoms began 2/14 to 2/18/04.  He reports she cannot climb, crawl, kneel, lift, push, pull, carry, bend, twist, stoop, reach above the shoulder level, perform multiple tasks or repetitive motions.  He reports she has received Social Security Disability as of 2/20/04.

On 3/21/04 Dr. Lawler reiterates his opinion given on 11/15/04 with no new clinical information reported.

A-D 536.  In the *Analysis of Medical Evidence* section of the addendum, Dr. Snyder notes regarding testing:

Updated clarification of testing noted in the previous file review indicates a possible elevation of TSH on 11/20/03 and a normal free T4.  A 8/28/03 chest x-ray notes no acute cardiopulmonary disease.  CK and CKMB fractions are normal (previously reported as 8/28/02).

A-D 536.  In addition to referring to his prior review, Dr Snyder states the following regarding clinical evaluations:

Notes from University of Oklahoma Medical Center include an 8/21/02 admission with discharge on 8/22/02.  This was shortly after surgery on 7/30/02 for cholecystectomy for gallstones and vertical banding for gastric bypass.  At the time [of] hospitalization on 8/21/02 there is report she had multiple grafts from previous burns.  Of note she did not have clubbing, cyanosis or edema reported.  Diagnoses on admission include atypical

chest pain, GERD, and hypertension.  During admission there is no clinical evidence or diagnostic findings consistent with congestive heart failure.

A 1/23/05 <u>emergency department</u> note from <u>Presbyterian Tower</u> Hospital by <u>Dr. Davis</u> indicates she was in for chest pain that she reported was different from previous chest pain.  She reports chest pain one day.  Dr. Davis indicates she was in no acute distress and had 100% O2 saturation. He reports her cardiac enzymes while in the emergency department were negative for acute infarction.  He reports she was given morphine and had no further pain.  In his evaluation he reports she has a history of chronic chest pain and refers to an 8/03 echocardiogram noting left ventricular hypertrophy with an ejection fraction of 65%.  He reports an EKG notes sinus bradycardia with first degree AV block and no acute ST or T-wave changes.  He reports an essentially unremarkable exam.  He notes no jugular venous distension.  He notes a regular rate and rhythm on cardiovascular exam, including no rubs or murmur.  Her lungs are clear. He reports no cyanosis or edema.  He recommends admission under the care of the Family Medicine Department.

The claimant appears admitted to the hospital under <u>Family Medicine</u> by <u>Dr. Coleman</u> as the attending physician.  An admission note of 1/24/05 was completed by <u>Dr. Pok</u>.  He notes a history of hypertension, chronic chest wall pain and fibromyalgia.  He notes she had skin grafts from burns as a child.  He reports here medications include atenolol, aspirin and Avapro. He reports her lungs are clear to auscultation.  He reports she has no reproducible chest wall pain.  He reports she has skin grafts on the right side of her neck, chest and back.  He notes a CBC, electrolytes and liver function studies are normal and notes a chest x-ray demonstrates mild cardiomegaly but otherwise was normal.  He recommends admission and treatment.  On 1/26/05 she is evaluated by <u>Dr. Lockwood</u>.  The claimant's history was reviewed.  Of note, the claimant reported she was permanently disabled due to fibromyalgia.  Her medications include aspirin, Losartan, Naproxen, acetaminophen, and nitroglycerin as needed.  A respiratory exam is unremarkable.  She has no jugular venous distension.  A cardiovascular exam reports a regular rate and rhythm with normal first and

second heart sounds.  She has no edema or cyanosis.  It is reported a cardiac catheterization in 2002 was normal.  It was opined her chest pain was likely non cardiac.  There is report of slight tenderness to palpation of the left second to fourth intercostal spaces and costosternal joints.  The plan included an echocardiogram.  On 1/27/05, she was discharged from the hospital.  In a note provided by <u>Dr. Hart</u> under the direction of Dr. Coleman, Dr. Hart reports a myocardial perfusion scan was performed on 1/25/05.  It noted inferior wall ischemia.  Her left ventricular ejection fraction is reported at 44%.  Adenosine testing reported no EKG changes.  An echocardiogram on 1/26/05 reported left ventricular hypertrophy with an ejection fraction greater than 50% and was otherwise within normal limits.  It was reported she was discharged to home.  She is opined to have hypertensive heart disease.

A-D 536-537.  In the May 12, 2005 addendum, Dr. Snyder summarizes his

analysis of the medical evidence as follows:

In summary, the claimant is a 42 year old former CCR Technician who stopped working in February 2002.  She has multiple conditions including obesity, chronic chest wall pain and hypertension.  Additional reported diagnoses/conditions include fibromyalgia and scarring of the back, neck and chest from burns as a child.  Little clinical information has been provided in regards to the treatment for excessive pain secondary to scarring (or other conditions) and/or findings of progressive loss of ability for upper extremity motion from February 2002 forward.  Clinically there has been no evidence given that she has ongoing congestive heart failure or is impaired by pain.  The treatment itself does not appear significant in regards to chronic pain.  The medical data does not indicate significant unstable angina or that she has had any medical interventions for recurrent congestive heart failure.

A-D 537.  In the addendum, Dr. Snyder stated his *Conclusions* as follows:

1.    Based on the medical data in the file and with a reasonable degree of medical certainty, the claimant appears to have scarring on her back, neck

13

and arms.  This appears as essentially life long scarring from burns as a child.  Based on the data provided, no specific restrictions are indicated or can be assessed of the upper extremities, neck or back as the data does not indicate loss of motion or function, a change in range of motion or contractures that preclude sedentary physical activities from 4/15/04 forward.

2. Additionally the provided data does not indicate the claimant has a cardiovascular condition that precludes sedentary physical demands from 4/15/04 forward.

3. In regards to bilateral knee pain, it appears she has been treated with a Cox II inhibitor with some benefit.  Her findings on knee exam would not preclude sedentary capacity from 4/15/04 forward.

4. Overall, as previously noted, there is inadequate medical data that would support the level of restrictions provided by the attending physician.  These notes appear as essentially repeated information with no clinical updated information.

5. For determination of her current limitations, an FCE could be performed. However, the data itself does not indicate her condition(s) changed significantly from a physical standpoint from 2/02 to 4/15/04 and forward to support restrictions from sedentary physical demands.  Restrictions given in my earlier review would be unchanged.

A-D 537.  Defendant's June 14, 2005 letter to plaintiff's attorney states that the medical data "does not indicate Ms. Davenport's condition changed significantly from a physical standpoint from February 2002 to April 15, 2004 and forward to support restrictions from sedentary physical demands."  A-D 523.  Defendant states that after "careful review of the information in Ms. Davenport's claim, we concur with the original determination that Ms. Davenport no longer meets the definition of disability under which she was insured."  A-D 523.

On March 20, 2004, plaintiff was notified by the Social Security
Administration that she was entitled to monthly disability benefits beginning
August 2002.  She received a lump sum payment of $12,314.25 from the date of
entitlement to benefits through February, 2004, and $885.00 per month
thereafter.  A-D 404-410.  This letter states that plaintiff's lawyer "cannot charge
you more than $4,104.75 for his or her work."  A-D 405.

The plan provides that if "other income benefits are payable for a given
month" the "monthly benefit payable under this Plan for that month will be the
Scheduled Monthly Income Benefit minus the total amount of all other income
benefits payable for that month."  A-D 6.  "Other income" includes benefits under
the federal Social Security Act.  A-D 7-8.  By letter dated May 13, 2004,
defendant notified plaintiff that it was necessary, under the plan, to decrease her
monthly benefit by the amount of her Social Security benefit.  A-D 411.  The letter
states that the amount of the overpayment was $23,815.93.  Defendant's
counterclaim seeks judgment against plaintiff in the sum of $23,815.93, together
with interest, costs and a reasonable attorney's fee.  Defendant's brief  indicates
that this amount should be reduced by that portion of the Social Security award
that was allocated for payment to plaintiff's attorney.  A-D 201.  Although the
counterclaim was not amended, it appears that the total amount defendant seeks
to recover from plaintiff under the plan is therefore $19,711.18 ($23,815.93 minus
$4,104.75).

### *Discussion*

Where, as here, the plan grants a plan administrator discretion in determining the grant of benefits under the plan, the court must uphold the decision of the administrator unless the court finds that the determination was arbitrary and capricious. <u>Firestone Tire & Rubber Co. v. Bruch</u>, 489 U.S. 101, 113-15 (1989).  In applying the arbitrary and capricious standard, the court will uphold the decision so long as it is predicated on a reasoned basis. <u>Kimber v. Thiokol Corp.</u>, 196 F.3d 1092, 1098 (10th Cir. 1999).  There is no requirement that the basis relied upon by the claims administrator be the only logical one or even the superlative one. <u>Id.</u>; <u>Nance v. Sun Life Assurance Co. of Canada</u>, 294 F.3d 1263, 1269 (10th Cir. 2002).  On review, the court need only assure itself that the claims administrator's decision falls "somewhere on a continuum of reasonableness – even if on the low end." <u>Kimber</u>, 196 F.3d at 1098 (citation omitted).

A lack of substantial evidence may indicate an arbitrary and capricious decision. <u>Caldwell v. Life Ins. Co. of N. Am.</u>, 287 F.3d 1276, 1282 (10th Cir. 2002).  Substantial evidence is of the sort that a reasonable mind could accept as sufficient to support a conclusion. <u>Id.</u>  Substantial evidence requires more that a scintilla, but less than a preponderance. <u>Sandoval v. Aetna Life & Cas. Ins. Co.</u>, 967 F.2d 377, 382 (10th Cir. 1992).  It is proper for the court to evaluate the substantiality of the evidence against the backdrop of the administrative record as

a whole.  Caldwell, 287 F.3d at 1282.  The administrator's decision will be upheld "unless it is not grounded on *any* reasonable basis." Cirulis v. UNUM Corp., 321 F.3d 1010, 1013 (10th Cir. 2003), *quoting* Kimber, 196 F.3d at 1097.

Because it is undisputed that defendant is not the ultimate payor of benefits under the plan, the court concludes that defendant does not operate under a conflict of interest that would give rise to a heightened level of scrutiny in this case.  *See* Fought v. UNUM Life Ins. Co. of Am., 379 F.3d 997, 1005 (10th Cir. 2004).

Mindful of the appropriate standard of review, the court finds that defendant's decision to deny plaintiff's claim for long term disability benefits was supported by substantial evidence.  Plaintiff contends that defendant ignored evidence of disability and emphasized evidence tending to negate a finding of disability.  However, the fact that there is inconsistent or contradictory evidence in the record does not render the administrator's decision unsupported by substantial evidence.  Upon review, the court finds that Dr. Snyder did not, as plaintiff claims, ignore the opinions of Dr. Lawler.  Rather, it appears to the court that Dr. Snyder concluded that he did not agree with Dr. Lawler's opinions because, in his view, little clinical information was provided to support them. Although plaintiff contends otherwise, independent medical examinations are not required under Fought, 379 F.3d at 1015, and defendant's failure to seek one does not render the claims decision arbitrary and capricious.  Further, nothing in

17

ERISA or its regulations suggests that the claim administrator must accord special deference to the opinions of treating physicians. Black & Decker Disability Plan v. Nord, 538 U.S. 822, 831 (2003). Thus, defendant cannot be faulted for failing to give the opinions of Dr. Lawler any special deference. To the extent plaintiff contends that Dr. Snyder himself indicated that a functional capacity examination of plaintiff would be helpful, the court rejects the contention that this indicates a serious procedural irregularity with respect to plaintiff's claim. The record indicates that while Dr. Snyder stated that such an exam could be performed, he further stated that his earlier analysis would remain unchanged due to his familiarity with the medical data.

Plaintiff makes much of the Social Security Administrative Law Judge's decision finding plaintiff disabled under Social Security guidelines and devotes a large portion of her briefs to a discussion of those proceedings.[3] Plaintiff overstates the significance of the Social Security Administrative Law Judge's analysis and conclusions in this proceeding, however. Claim administrators such as defendant are not bound by determinations made in Social Security cases because the criteria for determining eligibility for Social Security disability benefits are substantively different than the criteria established by many insurance plans. Smith v. Metropolitan Life Insurance Company, 344 F.Supp.2d 696, 703 (D.Colo.

---

[3]     Plaintiff acknowledges that the complete decision of the Social Security judge is not part of the administrative record in this case. Defendant asserts that much of the medical evidence cited by the Social Security Administrative Law Judge was not provided to it by plaintiff.

2004), *citing* Pari-Fasano v. ITT Hartford Life & Accident Ins. Co., 230 F.3d 415, 420 (1st Cir. 2000).

In carefully considering the arguments and contentions of the plaintiff, the court cannot say that defendant's decision was not grounded on *any* reasonable basis.  Having thoroughly reviewed the entire administrative record, the court concludes that defendant's decision denying plaintiff's long term disability benefits is supported by substantial evidence and should be and is hereby affirmed. Judgment in defendant's favor on plaintiff's claim will be entered pursuant to the federal rules of civil procedure.

Turning to defendant's counterclaim, the court initially notes that the counterclaim itself, as filed, does not allege a specific legal basis.  Defendant's minimal briefing supporting its counterclaim for restitution indicates that defendant's claim is brought under 29 U.S.C. § 1132(a)(3), as an attempt to "obtain other appropriate equitable relief."

While the Supreme Court has recognized that restitution actions in equity are maintainable under § 1132(a)(3), the court finds that defendant's counterclaim fails to allege or prove certain elements required by the court in Great-West Life & Annuity Ins. Co. v. Knudson, 534 U.S. 204, 213-214 (2002). As noted by plaintiff, the Tenth Circuit discussed the Great-West case in Administrative Committee of the Wal-Mart Associates Health and Welfare Plan v. Willard, 393 F.3d 1119 (10th Cir. 2004).  There, the court noted that following

19

Great-West, several circuits have addressed whether a plan administrator may maintain an action for "appropriate equitable relief" to enforce a reimbursement provision after a plan beneficiary has received compensation from a third party. Id. at 1122.  The court went on to say: "Identifying the key facts discussed and relied upon in Great-West, courts have applied a three-part test: 'Does the Plan seek to recover funds (1) that are specifically identifiable, (2) that belong in good conscience to the plan, and (3) that are within the possession and control of the . . . beneficiary?'"  Id. at 1122 (citations omitted).

Considering this language in the Willard case, the court finds it appropriate, in determining whether defendant's counterclaim may proceed under § 1132(a)(3), to apply the three-part test set forth above.  In applying this test, the court has reviewed the administrative record and the statement of facts provided by defendant in support of its counterclaim.  Based upon this review, the court finds that, even assuming for the sake of argument that defendant meets the first two parts of the test, there is no allegation and certainly no evidence that the overpayments are within the possession and control of the beneficiary, *i.e.*, the plaintiff.[4]  As the party bearing the burden of proof on its counterclaim, defendant

---

[4]       In her response brief, plaintiff refers to the three-part test and asserts, without citation to the record, that "there are no such funds[.]" Although the court is not obliged to sift through the record for facts supportive of either party's position, there are "shorthand" entries in the record to indicate that plaintiff informed defendant that she could not repay the overpayment.  *See* A-D 180 ("as for the overpayment [plaintiff] would have to send in mnthly paymnt. . . [plaintiff] not able to send in anyt[h]ing at this time"); A-D 172 ("[plaintiff] not able to send in anything . . . if she gets the clm reinstated that she will be able to use that money to pay the ovpmnt"); A-D 135 ("[plaintiff] will not be able to make any type of arrangement for reimb but she is working on trying to have the claim reinstated so it could be paid back [through] withholding").

has failed to come forward with sufficient evidence to show entitlement to relief under the pertinent legal authorities.  Accordingly, the court finds that defendant is not entitled to judgment on its counterclaim.

### *Conclusion*

Defendant's decision denying plaintiff's claim for long term disability benefits should be and is hereby **AFFIRMED.**  Defendant's counterclaim should be and is hereby **DENIED.**  Judgment shall issue on a separate document in accordance with the Federal Rules of Civil Procedure.

It is so ordered this 17th day of October, 2006.

TIM LEONARD
United States District Judge